Affirmed and Memorandum Opinion filed May 28, 2009








Affirmed and Memorandum Opinion filed May 28, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-07-00703-CR

____________

 

CINDY LEE JAHANIAN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 183rd
District Court

Harris County, Texas

Trial Court Cause No. 1059702

 



 

M E M O R A N D U M   O P I N I O N








Appellant Cindy Lee Jahanian was found guilty of engaging
in organized criminal activity with family members and others to commit, and
conspire to commit, the offense of theft of property valued at over $200,000. 
The scheme involved switching the universal product codes (AUPCs@) or bar codes on
certain items sold at stores such as Target, Wal-Mart, Home Depot, and Lowe=s with the UPC
codes for lower-priced items, purchasing the original items for less than their
actual sales price, and then selling them on eBay, an internet auction site. 
Cindy was sentenced to thirty years= confinement in
the Texas Department of Criminal Justice, Institutional Division.

On appeal, Cindy raises four issues.  In the first, she
contends the trial court erred by failing to instruct the jury on value as
provided in section 31.08 of the Texas Penal Code, and that this error caused
egregious harm because the value of the stolen property was a contested issue
and, without an instruction, the jury was unable to determine whether the
evidence supported the aggregate value alleged.  In her second and third issues,
Cindy contends the evidence is legally and factually insufficient to support a
conviction for theft of property of over $200,000.  In her fourth issue, Cindy
contends that her lawyer rendered ineffective assistance for failing to request
an instruction on value under Penal Code section 31.08.  We affirm.

Factual and Procedural Background

Cindy does not dispute the evidence that she participated
in organized criminal activity.  The evidence showed that from January 2004
through February 2006, Cindy and other members of the Jahanian family,
including Bahram AB.J.@ Jahanian, Cindy=s husband, and
their son and daughter, Nicholas Jahanian and Krystal Jahanian, participated in
a theft scheme to unlawfully obtain merchandise from stores throughout Texas
and to sell the merchandise for profit though Nicholas Jahanian=s eBay account
named ABwatchers.@[1]  Others also
participated in the scheme, including three accomplices who testified during
the trial, Valerie Baker, Elizabeth Espirit, and Richard Schroeder.  The stores
targeted in the scheme included Target, Wal-Mart, Home Depot, and Lowe=s. 
Representatives of these stores were named as the owners of the property in the
indictment against Cindy. 








Cindy=s husband, B.J., was confined in a Texas
prison during the time the theft scheme operated.  Despite his confinement, he
instructed the others as to how to carry out the scheme during prison visits
with Nicholas or by mail sent from prison to Cindy at her residence, which she
shared with Krystal Jahanian, located at 19615 Spanish Needle in Harris
County.  B.J.=s advice included telling them to stay away from
Target stores, to go out of town more, and to use more than two drivers.  He
also did not want Nicholas involved in going to the stores.

The scheme operated as follows.  Cindy, Krystal, and an
accomplice, usually Elizabeth Espirit but sometimes Richard Schroeder, would
drive to one of the stores somewhere in Texas, and Cindy and Krystal would
enter the store with labels showing UPC codes for low-end or low-priced
merchandise that they or someone else in the theft ring had purchased or stolen
for the purpose of getting the bar codes.[2] 
Once inside the store, Cindy and Krystal located usually at least two high-end
items such as MP3 players, faucets, cameras, phones, DVD recorders, or
printers.[3] 
While one acted as lookout, the other placed the bar-code labels for the
lower-priced merchandise over the bar code shown on the high-end items so that
the desired merchandise could be purchased for a substantially lower price.  








Once the bar codes were switched, Cindy or Krystal placed a
cell-phone call to the accomplice, who separately entered the store, and gave
the accomplice a description of the desired merchandise and its location. 
Cindy and Krystal then left the store, and the accomplice, who was also
permitted to purchase a very low-priced item for personal use at the ring=s expense, would
locate the merchandise and attempt to check out with it.  When possible, the
accomplice would take the merchandise to a check-out counter occupied by a
young, seemingly inexperienced clerk.  When the merchandise rang up at the
lower price shown by the switched bar code, the accomplice paid for it and the
personal item, left the store, and returned to the car.  The three would then
either go to another store or quit for the day.  Cindy and Krystal would then
store the stolen merchandise either at their home or a storage unit they
maintained.

To dispose of the merchandise, Nicholas Jahanian sold the
items on eBay using his eBay account, known as ABwatchers,@ and sent the
merchandise to whomever had purchased it.[4] 
Nicholas then distributed the profits among himself and the other members of
the ring, including Cindy and Krystal.  The eBay business prospered and
supported Nicholas, Cindy, and Krystal.

Doug Osterberg, an investigator in the Harris County
District Attorney=s Office Special Crimes Division,
testified extensively about his involvement in the investigation of the theft
ring and its operation.  He also provided testimony about the value of the
stolen property.  Among other things, Osterberg testified that records obtained
from eBay showed that the types of items being sold through the Bwatchers
account were MP3 players, faucets, electric razors, cordless phones, print
servers, and cameras, most of which were listed as Anew in box.@  For the period
that eBay records were available, October 2004 to the end of October 2005,
Bwatchers sold 2,109 items for a total of about $258,000.  At this point,
Osterberg decided to contact the loss-prevention departments of several of the
stores for assistance.  Store personnel and additional officers conducted
surveillance on the ring, and the jury was shown security-camera videos of the
ring=s operation.   








On cross-examination, Osterberg explained that he went over
the records of the Bwatchers account with loss-prevention personnel, and
although they were able to show that there were losses in the areas of those
types of products, they could not say that specific items on the list actually
came from their stores.  Osterberg agreed that the only items actually traced
back to specific stores were those that the ring was observed stealing during
surveillance.  He also agreed that the eBay list did not show how much the
Jahanians might have paid to acquire the items originally; it showed only the
price that eBay customers paid Bwatchers for the items.[5] 
He also admitted that some of the merchandise came from other stores not
included in the case.  

Osterberg further testified that his office calculated the
amount of the stores= losses primarily by using the eBay
records.  When asked if he knew what the ring actually paid for the items, he
explained that the sales price was usually either about $27 or $7, depending on
which of two fake bar codes they decided to use.  The bar codes were copied
from Lexmark ink printer cartridges and water filters the ring purchased. 
Osterberg stated that his testimony was based on information from other
participants in the ring and evidence seized from Cindy=s and Nicholas=s homes and a
storage unit Cindy controlled.  








Larry Boucher, another investigator with the Harris County
District Attorney=s Office, and Osterberg=s direct
supervisor, also testified concerning his participation in the surveillance of
Cindy, Krystal Jahanian, and Elizabeth Espirit on January 26, 2006.  The
surveillance captured both successful and unsuccessful attempts to carry out
the theft ring=s operation.  On that day, Boucher observed the group
first going to a Target in Harris County, where their activities were captured
on video.  Boucher testified that the video showed Cindy and Krystal enter the
Target, examine a Kodak printer bundle, consisting of a camera and printer
dock, priced at $249.99, and put two of them in a cart.  Elizabeth Espirit
entered after Cindy and Krystal, but ultimately they abandoned the effort and
went to another Target store.[6]

After leaving the second Target store, the trio then went
to a Wal-Mart in Brenham, where they were again captured on video.  The video
showed Cindy and Krystal going down an aisle where phones were sold, but they
left without buying anything.  Elizabeth Espirit separately entered the store,
went to the same aisle, and picked up two boxes of Panasonic cell phones along
with some children=s socks.  She then went to a self-checkout
aisle and attempted to scan the items, but when a cashier came over to assist
her, the cashier saw that the phones were ringing up as $27.97.  The cashier
peeled off the UPC codes, and the phones rang up as $154.96.  Espirit made an
excuse and left the store without purchasing anything. 

Boucher testified that the surveillance continued as the trio
next went to a nearby Lowe=s store.  There, after Cindy and Krystal
went to an aisle containing water filters, Espirit later went to the same
aisle, picked up four Brita water filters, and purchased them for $6.96 apiece,
when their actual price was around $32 apiece.  The trio then continued on to a
Home Depot in Brenham.  As before, they were captured on video, and Boucher
described their activities.  At the Home Depot, Cindy and Krystal went down an
aisle where faucets were located, and Espirit entered the store separately and
went to the same aisle, picked up two faucets, and checked out.  The faucets
rang up as water filters for $26.97 apiece.  Boucher testified that the faucets
were actually priced at $208.  On cross-examination, Boucher admitted that the
total amount of loss from the stores where merchandise was purchased, after
subtracting what was paid, came to roughly $600.  He also admitted that he did
not see Cindy or Krystal switching the UPC codes, nor did he see them walk out
of the stores with any merchandise.  He also never came in contact with
Nicholas Jahanian.








Pat Smith, also an investigator with the Harris County
District Attorney=s Office, rode with Boucher during the
surveillance.  He
testified that, after Cindy, Krystal, and Espirit left the Brenham Home Depot,
they went to a Wal-Mart and a Lowe=s in Bryan.  They left the Wal-Mart
without any merchandise.  At the Lowe=s, however, he observed Cindy and
Krystal go to the plumbing aisle where they were Ahandling and looking at@ Delta brand faucets.  He saw Krystal
return a box to the shelf as Cindy talked on a cell phone.  They left the
aisle, but then returned and handled the boxes again, as Krystal talked on a
cell phone.  He then saw Espirit, who was talking on her cell phone, go
directly to the same area, where she picked up the same boxes, put them in her
basket, and purchased them.  After the trio left the store, Smith spoke with
the cashier and determined that they had purchased two Delta faucets retailing
for $208 apiece for approximately $27 apiece.  The tape register from the
transaction reflected that Espirit purchased water filters, but Smith testified
that was not what he saw her purchase, and a still photograph taken from video
of the purchase also showed that she was buying a Delta faucet.

Smith also testified that, as a part of the investigation,
he used his own eBay account to purchase a Delta faucet from Bwatchers.  Emails
confirmed that the purchase was shipped from Abaywatch@ at Cindy=s Spanish Needle
address, and that Smith paid Anickjahanian@hotmail.com@ $157.50 for the Anew in box@ faucet.  The
return address on the packaging in which he received the faucet also reflected
Cindy=s Spanish Needle
address.  On cross-examination, Smith admitted there was no way to determine
where the faucet he bought from Bwatchers came from.  He also testified that
there was no way for retailers to trace an item purchased on eBay back to a
particular store.








Valerie Baker, Nicholas Jahanian=s former
girlfriend, testified that Nicholas eventually revealed to her the theft ring=s operation after
the relationship grew more serious.  Among other things, Baker testified that
they often chose Wal-Mart and Target stores because they had young cashiers who
did not know the price of electronics.  The types of items she saw Cindy and
Krystal deliver to Nicholas included shavers, paintball guns, faucets, phones,
cameras, and other electronics.  Baker testified that she helped Nicholas steal
by assisting him in packaging the stolen items to be sent to purchasers.  On
cross-examination, Baker admitted that she never saw Nicholas, Cindy, or
Krystal steal anything, and all her information concerning the theft ring=s operation came
from Nicholas only.  She also admitted that she and Nicholas sold some
legitimate items on eBay and that they had joined a wholesalers club.  She
further admitted that she could not deny that Cindy or Krystal may have
obtained items from places like flea markets or pawn shops to sell on eBay.

Dee Williams, a loss-prevention manager at Target, also
participated in the surveillance of Cindy, Krystal, and Espirit on January 26,
2006.  She testified about details of the ring=s operation from
her observations and the videos.  She also testified that, while visiting a
Pasadena Target, she learned that two days earlier, on January 24, Cindy,
Krystal, and Espirit attempted to carry out their operation at that store. 
Store video showed Cindy and Krystal entering the store, and Espirit entering
shortly thereafter.  Cindy and Krystal removed Kodak bundle packs from a shelf
and went to the back of the store.  Several minutes later, they returned the
merchandise to the shelf.  Espirit then picked up two Kodak bundle packs from
the shelf and attempted to check out with them.  The items, which were priced
at $249.99 apiece, rang up as Lexmark printer cartridges for $27.99 apiece. 
The cashier saw that the items were not ringing up at the correct price and
informed the loss-prevention team.  She also peeled off the UPC codes and
re-scanned the items at their correct price.  Espirit did not purchase the
items.








Williams further testified that the Jahanians= operation enabled
them to actually pay as little as $6 for each stolen item, and that they could
even make money on the purchases aside from just the sales on eBay.  She
explained that they would purchase a Lexmark printer cartridge costing $27 for
$6 by switching the correct UPC code with the UPC code for a $6 water filter. 
Once the printer cartridge was obtained, the Jahanians would have a UPC code
for that item to use to purchase the more expensive items like cameras,
high-dollar phones, and shavers for $27 each.  When they purchased a more
expensive item for $27, they received a receipt showing the purchase of a
Lexmark printer cartridge for $27.  They would then use that receipt to return
the printer cartridge (for which they actually paid $6) and obtain a refund of
$27 (for a net profit of $21).  Thus, Williams testified, the ring could
actually make money on the Lexmark printer cartridge purchase.  And, by
employing this scheme, it cost the Jahanians $6 to steal a high-dollar item
like a shaver, phone, or camera.

Williams also testified that the ring had made such a
transaction at the Pasadena Target.  She explained that video from that Target
showed that a little less than an hour before Espirit attempted to purchase the
Kodak printer bundles, Cindy was shown returning two Lexmark printer cartridges
in exchange for cash totaling $57.50.  From the original receipt, Williams was
able to determine that the purchase was made on January 19, 2006, five days
earlier, at a Target in San Antonio.  Photographs from that store showed
Espirit buying two shavers, priced at between $150 and $250, that rang up as
Lexmark printer cartridges.  That purchase generated the receipt Cindy used to
return Lexmark printer cartridges in exchange for cash.  Thus, Williams
testified, the ring was able to purchase about $400 worth of merchandise for
about $50, and then obtain a refund of about $50 from a $6 purchase.  Williams
further testified that she was able to identify numerous similar transactions
at Target stores in other locations, such as Galveston, Clear Lake Shores,
Kemah, Baybrook, Pearland, Tomball, and San Antonio.  

On cross-examination, Williams testified that the overall
loss figure for the transactions she observed and was able to document was
approximately $2,500.  On redirect, however, she explained that this amount was
based on her investigation of a roughly thirty-day period in a limited
geographical area.








The State=s next witness was Elizabeth Espirit.  She
testified that she had served jail time for engaging in the theft ring
involving Cindy, Krystal, and Nicholas.  She explained that she became involved
through her husband, who was in the Harris County jail with B.J. Jahanian. 
B.J. had given her husband Krystal=s phone number so
that Espirit could call her about some work.  She testified that Cindy and
Krystal would give her instructions, and they would go to Target, Lowe=s, Wal-Mart, Home
Depot, and Academy stores to carry out the scheme.  She also testified to the
details of the theft ring=s operation, and confirmed that the ring
stole all of the kinds of items listed on the indictment.  She testified that
they typically went out once or twice a week to steal, and each time they would
go to between four and seven stores.  Usually they would get one or two
expensive items, unless they were getting ink cartridges, in which case they would
get several.  Concerning refunds, Espirit testified that they would use
receipts to get cash, but if they did not have a receipt, they would take a
previously stolen item to one of the stores and get a gift card.  She estimated
that she personally stole about $160,000 worth of merchandise.  

On cross-examination, Espirit admitted that she really did
not know how much she had stolen.  She also admitted that she had met Nicholas
Jahanian only once, and testified that he never gave her any instructions and
she never saw him handle any stolen merchandise.  She also testified that,
after she spent time in jail, she pleaded guilty and was sentenced to ten years=
deferred-adjudication probation and ordered to pay $50,000 in restitution.








Richard Schroeder, another participant in the theft ring,
testified that he stole with the Jahanians from 2004 until 2006, and that he
had previously been arrested for stealing with them.  Most of the time, he
would go with Cindy and Krystal, or Krystal and her ex-husband, to stores in
and around various Texas cities, including Austin, San Antonio, Dallas, Fort
Worth, Arlington, and Houston.  As an example, Schroeder testified that they
would go to Dallas about once a month and spend three or four days there.  Each
day they would go to eight to ten stores.  In Houston, they would go out three
or four days a week, and he went with them for over a year.  Schroeder also
testified that he and Nicolas once went to a Wal-Mart where Nicholas changed
the bar code on a flat-screen television and Schroeder was arrested when he
attempted to check out with the item.  Nicholas was not arrested because he had
already left the store.  On cross-examination, Schroeder admitted that Nicholas
never gave him any instructions or bar codes, and never gave him any money.

Jeremy Roble, a fraud investigator at eBay, explained how
the eBay online-auction process works, and confirmed that the market is
worldwide for items sold on eBay.  He also explained that to put something for
sale on eBay, one must create an eBay username or account, and have an e-mail
address.  He testified that he responded to a subpoena for records in this
case, and in searching for information, he found that Nicholas Jahanian first established
an account with eBay in August 2003, under the username Nick Jahanian, and he
provided the e-mail address of ANickJahanian@hotmail.com.@  In October 2004,
the username changed from Nick Jahanian to Bwatchers and the e-mail address
changed to AeBaywatchers@hotmail.com.@  Roble further
testified that State=s Exhibit 2A listed all of the
transactions involving the Bwatchers account, and that the total sales price
for the listed items was $258,970.36.  He further testified that the list would
not include sales after the end of October 2005, when he responded to the
subpoena, and so it would not include sales from November 2005 through February
2006.

Todd Quattlebaum, the president of EZ Bayer, Incorporated,
testified that his company buys and sells inventory for businesses and
individuals on eBay.  He testified that in 2003, Nicholas Jahanian listed some
Panasonic DVD recorders and other items for sale through the company. 
Quattlebaum testified that Nicholas told him he was getting the items from a
wholesaler.  Quattlebaum also testified that the items Nicholas brought were
all factory-sealed.  After subtracting the company=s fees for its
services, Quattlebaum=s records reflected 141 transactions for
Nicholas totaling $13,611.23.  Quattlebaum also estimated that his records did
not reflect an additional twenty or thirty transactions.








Marshall Poe, a loss-prevention manager for Home Depot,
testified as a representative of Home Depot and was one of the persons alleged
in the indictment to be the owner of the stolen property.  He testified that he
participated in the surveillance on January 26, 2006, of Cindy and Krystal at
the Home Depot.  He identified numerous items from State=s Exhibit 2A as
the type of items sold by Home Depot.  He also testified that he had a greater
right to possess items stolen from Home Depot than the thief who had stolen
them.  On cross-examination, Poe acknowledged that Home Depot did not sell some
of the types of items on the list.  He also could not attribute the loss of
specific items to the Jahanians, and he did not know whether items on the list
came from the Home Depot.  Poe further testified that Home Depot did not have
the technology to determine whether someone had been switching bar codes, and
there was no way for them to check to see if they had video of the Jahanians
conducting their activities in their stores.  Poe also confirmed that Home
Depot did not have the ability to track a serial number from a package to a
particular store.  He further testified that Home Depot employees purchased two
items over the internet from Bwatchers, and the items were shipped from Cindy=s Spanish Needle
address.

Tim Scott, who worked in loss prevention at Lowe=s, also testified
as that store=s representative and was alleged in the indictment to
be an owner of the stolen property.  He identified items on State=s Exhibit 2A as
the types of items Lowe=s sells, and testified that he had a
greater right to possess merchandise stolen from Lowe=s than the thief
who had stolen it.  On cross-examination, he acknowledged that there were items
on the list that Lowe=s did not sell, and other than the items
he saw the Jahanians steal during his participation in the January 2006 surveillance,
he could not tell whether the items on State=s Exhibit 2A were
Lowe=s property.  Scott
also acknowledged that Lowe=s did not have the technology to match a
bill of lading for items at Lowe=s to the items
sold on eBay.








Thomas Brady Bailey similarly testified as Target=s representative
and was another person alleged in the indictment to be an owner of the stolen
property.  Bailey, an investigator specializing in organized-crime
investigations with Target, and who was then assigned to the United States
Secret Service Federal Task Force, was also involved in the surveillance of the
Jahanians on January 26, 2006.  He testified that he had a greater right to
possess the stolen items than the thief.  He also testified that Target did not
have the technology to trace a specific item back to a particular Target
store.  Bailey identified the types of items listed on State=s Exhibit 2A that
were sold at Target.  

At the prosecutor=s request, Bailey
had previously picked out some of the items from the list to compare what
Nicholas Jahanian sold them for on eBay to the sales price at Target.  He
testified that the average difference was thirty percent.  Accordingly, Bailey
testified that, applying that percentage to all of the stores, the $258,970.36
figure shown on State=s Exhibit 2A would have to be increased by
approximately thirty percent to determine the approximate retail value of the
property.  On cross-examination, Brady identified items on State=s Exhibit 2B that
Target did not sell.  He also confirmed that the percentage of loss numbers he
was asked to calculate by the district attorney=s office were
estimates.

The last of the store representatives who was alleged in
the indictment to be an owner of the stolen property was Mary Jo Meador, who
testified as a representative of Wal-Mart.  She testified that Wal-Mart sold
many of the types of items listed on State=s Exhibit 2B, and
also testified that she had a greater right to possess the items stolen than
the thief.  On cross-examination, she identified items on the list that
Wal-Mart does not sell.  She also admitted that she could not trace any of the
items on the list back to Wal-Mart, and she acknowledged that some of the items
were sold by numerous retailers.  She also admitted that she was not able to
document any loss resulting from the Jahanians= activities. 
Finally, she acknowledged that she could not say that she had a greater right
of control over any item specifically listed on State=s Exhibit 2A.








Larry Boucher, Osterberg=s supervisor at
the district attorney=s office, was recalled to the stand, and
he testified concerning the arrests of Cindy, Krystal, and Nicholas Jahanian
and the execution of the related search warrants.  He described how Cindy and
Krystal were arrested at Cindy=s house on Spanish Needle.  In executing
the search warrant, the officers found, among other things, a printer and fax
machine, an envelope containing UPC codes, and the paper stock on which UPC
codes would be printed.  The codes matched those recovered during the
surveillance of Cindy, Krystal, and Espirit.  In Krystal=s car, parked
outside the house, they found more UPC codes in Krystal=s purse, and in
the passenger-door compartment they found more of the paper stock used to print
UPC codes as well as two pairs of scissors.  In the trunk, they found several
Target bags and receipts from Target, Wal-Mart, and Lowe=s for items
purchased for use in the theft scheme.  

Boucher also described what was found in a storage unit
that was searched with Cindy=s consent.  There, the investigation team
found nearly one hundred shopping bags.  The largest number came from Target,
and many of the bags had loose UPC codes stuck to them.  There were also bags
from Wal-Mart, Lowe=s, Home Depot, and Academy, along with
some crumpled UPC codes.  The officers also found at the storage facility
shipping boxes labeled with Nicholas Jahanian=s name and
address.

The defendants, including Cindy, rested after the State
presented its case and did not present any testimony or other evidence.

Cindy=s Issues

On appeal, Cindy raises four issues: (1) she was
egregiously harmed by the trial court=s failure to
submit a jury instruction on value under Texas Penal Code section 31.08; (2)
the evidence is legally insufficient to support her conviction; (3) the
evidence is factually insufficient to support her conviction; and (4) defense
counsel=s failure to
request jury instructions on value under Penal Code section 31.008 constituted
ineffective assistance of counsel.  We will first address legal and factual
sufficiency, and we will then address Cindy=s first and fourth
issues in that order.








I.        Legal
and Factual Sufficiency of the Evidence

In her second and third issues, Cindy contends the evidence
is legally and factually insufficient to support her conviction for engaging in
organized criminal activity of theft of property over $200,000.

A.      Standards
of Review 

When reviewing challenges to both the legal and factual
sufficiency of the evidence supporting the verdict, we first review the
legal-sufficiency challenge, because if successful, a legal-sufficiency
challenge requires an acquittal rather than a remand to the trial court.  See
Clewis v. State, 922 S.W.2d 126, 132B33 (Tex. Crim.
App. 1996); Stafford v. State, 248 S.W.3d 400, 404 (Tex. App.CBeaumont 2008,
pet. ref=d).  In reviewing
the legal sufficiency of the evidence, we look at the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact
could have found the essential elements of the crime beyond a reasonable
doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Vasquez v.
State, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002).  Although we consider all
evidence presented at trial, we may not re-weigh the evidence and substitute
our judgment for that of the jury.  King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000).  The jury is the exclusive judge of the credibility of
witnesses and of the weight to be given their testimony, and it is the
exclusive province of the jury to reconcile conflicts in the evidence.  Mosley
v. State, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998).








In reviewing the factual sufficiency of the evidence, we
view all of the evidence in a neutral light.  See Cain v. State, 958
S.W.2d 404, 408 (Tex. Crim. App. 1997); Clewis, 922 S.W.2d at 134.  We
may set the verdict aside if (1) the evidence is so weak that the verdict is
clearly wrong and manifestly unjust; or (2) the verdict is against the great
weight and preponderance of the evidence.  Watson v. State, 204 S.W.3d
404, 414B15 (Tex. Crim.
App. 2006) (citing Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000)).  While we may disagree with the jury=s conclusions, we
must exercise appropriate deference to avoid substituting our judgment for that
of the jury, particularly in matters of credibility.  Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005); see also Watson, 204 S.W.3d
at 414 (stating that an appellate court should not reverse a verdict it
disagrees with unless it represents a manifest injustice, though supported by
legally sufficient evidence).  Thus, while we are permitted to substitute our
judgment for that of the jury when considering credibility and weight
determinations, we may do so only to a very limited degree.  Marshall v.
State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006).

Circumstantial evidence is as probative as direct evidence
in establishing an actor=s guilt.  Guevara v. State, 152
S.W.3d 45, 49 (Tex. Crim. App. 2004).  Indeed, circumstantial evidence alone is
sufficient to establish guilt.  Id.  Furthermore, the standard of review
on appeal is the same for both direct and circumstantial evidence cases.  Id.


Both legal and factual sufficiency are measured by the
elements of the offense as defined by a hypothetically correct jury charge.  See
Woolly v. State, 273 S.W.3d 260, 268 (Tex. Crim. App. 2008).  A
hypothetically correct charge is one that accurately sets out the law, is
authorized by the indictment, does not unnecessarily increase the State=s burden of proof
or unnecessarily restrict the State=s theories of
liability, and adequately describes the particular offense for which the
defendant was tried.  Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim.
App. 1997).








A person engages
in organized criminal activity Aif, with the intent to establish,
maintain, or participate in a combination or in the profits of a combination, .
. . he commits or conspires to commit@ one of several
enumerated offenses, including theft.  Tex. Penal Code Ann. ' 71.02(a)(1)
(Vernon 2003 & Supp. 2008).  Theft is committed when a person Aunlawfully
appropriates property with intent to deprive the owner of property.@  Tex. Penal Code
Ann. ' 31.03(a) (Vernon
2003 & Supp. 2008).  AAppropriate@ means Ato acquire or
otherwise exercise control over property other than real property.@  See Tex.
Penal Code Ann. ' 31.01(4)(B) (Vernon 2003 & Supp.
2008).  Appropriation of property is unlawful if it is Awithout the owner=s effective
consent@ or Athe property is
stolen and the actor appropriates the property knowing it was stolen by
another.@  See Tex.
Penal Code Ann. ' 31.03(b)(1), (2).    B.      Application
of Law to Facts

1.       Sufficiency
of the Evidence that Cindy Committed Theft of Property over $200,000

Cindy does not challenge the evidence regarding her
participation in a combination, and she concedes that the State proved that a
theft occurred as an object of the combination and pursuant to a scheme and
continuing course of conduct.  She contends, however, that the evidence is
legally and factually insufficient to show that (1) she personally committed a
theft, and (2) the value of the items shown to have been stolen adds up to over
$200,000.  Because Cindy briefs her legal- and factual-sufficiency issues
concerning each sub-issue together, we will address them similarly.

(a)     Evidence
that Cindy committed theft

Cindy first argues that there is no evidence she personally
committed a theft, and because the jury was not authorized to convict her under
the law of parties, the evidence is insufficient to support her conviction. 
She points out that police surveillance and videotapes of multiple transactions
confirmed that she never personally stole any items, because it was customary
for her to have left the store before any item was purchased using a fake UPC
code.  Additionally, Cindy points to Elizabeth Espirit=s testimony that
Cindy was typically outside a store when she would purchase an item.  In the
absence of an instruction on the law of parties, Cindy argues, the charge
required a finding that Cindy personally committed theft, and the evidence is
insufficient to support the jury verdict since Cindy never personally stole
anything.








But if the hypothetically correct jury charge for the case
would authorize the jury to convict on alternative theories of liability, then
we must deem the evidence sufficient if it is sufficient under any of the
theories of liability.  Garza Vega v. State, 267 S.W.3d 912, 915 (Tex.
Crim. App. 2008).  Under the indictment and the evidence detailed above, the
jury could have been authorized to convict Cindy as a party.  See Tex.
Penal Code Ann. ' 7.02 (Vernon 2003).  Cindy concedes as
much in her brief, admitting that her Astatus as a party
to the object offense, the theft, could certainly have been contained in the
jury charge.@  Cindy argues, however, that because the prosecutor Aaffirmatively
approv[ed]@ the lack of a parties charge, the State is precluded
from urging on appeal that the sufficiency of the evidence should be measured
by the hypothetically correct jury charge.  

To support her contention, Cindy relies on Adi v. State,
94 S.W.3d 124 (Tex. App.CCorpus Christi 2002, pet. ref=d).  In that case,
Adi was indicted for engaging in organized activity based on an insurance-fraud
scheme.  The State requested an instruction on the law of parties, but the
trial court erroneously denied it.  Id. at 130B31.  Despite the
lack of a parties instruction, the court of appeals reviewed the evidence
according to a hypothetically correct jury charge that included a parties
instruction, and determined that the evidence was both legally and factually
sufficient to support Adi=s conviction.  Id. at 131.  Nothing
in Adi supports Cindy=s conclusion that, because the State
abandoned its request for a parties charge, we are prohibited from reviewing
the legal and factual sufficiency applying a hypothetically correct jury charge
that includes a parties instruction.  It is irrelevant in a sufficiency review
that the application paragraph of the charge actually given did not include a
parties instruction.  See Garza Vega, 267 S.W.3d at 916.








We therefore reject Cindy=s contention that
the absence of a parties instruction from the charge required the State to
prove that she personally committed a theft.  Accordingly, we apply the
hypothetically correct jury charge, including an instruction on the law of
parties, to analyze the legal and factual sufficiency of the evidence that
Cindy committed or conspired to commit a theft.  Given Cindy=s admission that
the State proved that a theft occurred as an object of the combination and
pursuant to a scheme and continuing course of conduct, and the extensive
evidence detailed above concerning Cindy=s participation in
the scheme, the evidence presented is legally and factually sufficient to
support Cindy=s conviction for engaging in organized criminal
activity, the object of which was to commit theft.  

Moreover, even if we reviewed the evidence  applying a
hypothetically correct charge without a parties instruction, proof that Cindy
exited the stores while in possession of the items was not necessary to sustain
a finding that she committed theft.  The removal of an item from its customary
location is sufficient to show that the defendant exercised control over the
item for purposes of the commission of a theft, even if the defendant never
removes the item from the premises.  See Baker v. State, 511 S.W.2d 272,
272B73 (Tex. Crim.
App. 1974) (rejecting contention that evidence was insufficient to prove theft
when proof showed defendant moved property from its original position at
business); Masters v. State, 437 S.W.2d 868, 869 (Tex. Crim. App. 1969)
(AIt is not
essential that appellant have removed the money from the premises of the
service station.@); In re C.L.W., Nos.
05-05-00754-CV, 05-05-00776-CV, 05-05-0777-CV, 05-05-00778-CV, 05-05-00779-CV,
2006 WL 321959, at *2 (Tex. App.CDallas Feb. 13,
2006, no pet.) (mem. op.) (AThere is no requirement that the property
actually be removed from the premises or kept for a specific length of time.@).








Here, the evidence was sufficient for the jury to find that
Cindy exercised control over and appropriated the stolen property with intent
to deprive the stores of it, even though she did not personally take it out of
any of the stores.  As Cindy admits in her brief, A[i]t is undisputed
that the modus operandi for the commission of thefts by the Jahanian family
called for appellant to switch UPC codes on products, then leave a store before
a third party purchased the products with the bogus UPC codes.  Police
surveillance established this pattern.@  Cindy therefore
admits to personally switching the bar-code labels.  The evidence also showed
that Cindy and her daughter, Krystal Jahanian, who lived with her at the time,
took possession of the stolen merchandise inside the stores by moving it from
the position it occupied in the store, switching the bar-code labels on the
merchandise with the bar-code label for a lesser-priced item, and replacing the
merchandise to its former position in the store.  An accomplice, such as
Elizabeth Espirit, later picked up the merchandise and then physically removed
it from the store and delivered it to Cindy=s and Krystal=s possession.

Cindy=s conduct in switching the bar codes,
which she admits in her brief, was legally and factually sufficient to show
that she personally possessed and exercised control over the stolen property,
and therefore unlawfully appropriated it, with the intent to deprive the owner
of it, even though she did not actually remove it from the stores.  See
Baker, 511 S.W.2d at 272B73; Masters, 437 S.W.2d at 869; In
re C.L.W., 2006 WL 321959, at *2; Tex. Penal Code Ann. ' 31.03(a), (b)(1)
& (2).  Thus, the evidence is legally and factually sufficient to support
Cindy=s conviction for
committing theft, even without applying the law of parties.

(b)     Evidence
of theft of property over $200,000

Cindy next argues that the evidence fails to support the
allegation that over $200,000 worth of property was stolen.  She contends that
it is Aundisputed@ that the State
failed to show the theft of many of the items set out in the indictment and the
jury charge.  Therefore, Cindy argues, the evidence is insufficient because the
value of the items shown to be stolen does not add up to an amount equal to or
greater than the amount alleged.  See Wiley v. State, 632 S.W.2d 746,
747B48 (Tex. Crim.
App. 1982).  








Specifically, Cindy complains that the witnesses were
unable to state that the list of eBay sales by Nicholas Jahanian included any
of the complainants= property, and the amount of property
confirmed stolen was minuscule compared to the $200,000 alleged.  As an
example, Cindy points to the testimony of Dee Williams, who testified that the
value of the items stolen from Target as shown on the videotapes was about
$2,500.  Further, Cindy complains that the evidence is insufficient because it
does not relate to the specific items owned by the complainants and it is based
on Aassumptions and
estimates.@  She points to Doug Osterberg=s testimony that
he was assuming that all of the items Nicholas Jahanian sold on eBay were
stolen, but he could not match any individual items from the eBay list to any
named complainant.  She also points to Elizabeth Espirit=s testimony that
she Amight have stolen@ property valued
at $160,000, but there was no attempt to link any thefts to the four named
complainants.

In essence, Cindy contends the State failed to prove that
the value of the property stolen exceeded $200,000 because the evidence is
insufficient to identify the property sold on Nicholas Jahanian=s eBay account as
the same property the theft ring stole from the stores.  But a fact finder can
determine the identity and ownership of stolen property from circumstantial
evidence.  See Jordan v. State, 707 S.W.2d 641, 644B45 (Tex. Crim.
App. 1986) (AProof of ownership may be made by circumstantial
evidence, just as any other issue in a criminal case.@); Jones v.
State, 458 S.W.2d 89, 91B92 (Tex. Crim. App. 1970) (A[A]rticles in an
accused=s possession may
be identified by circumstantial evidence as well as by direct testimony.  If it
appears it or they correspond with articles that were stolen, the question may
go to the jury.@); Villani v. State, 116 S.W.3d
297, 306 (Tex. App.CHouston [14th Dist.] 2003, pet. ref=d) (AProof of ownership
may be made by circumstantial evidence.@); Robinson v.
State, No. 01-85-00970-CR, 1986 WL 12889, at *2 (Tex. App.CHouston [1st
Dist.] Nov. 13, 1986, pet. ref=d) (not designated for publication) (AIt is well settled
that the identity and ownership of stolen property may be established by
circumstantial evidence.@).








Here, the State presented circumstantial evidence,
accomplice testimony, and other evidence to establish that most, if not all, of
the property shown on State=s Exhibit 2A was stolen from the stores
whose representatives are named in the indictment.  The testimony from the
store representatives established that each of the stores sold in varying
degrees merchandise of the types alleged in the indictment that State=s Exhibit 2A
reflected was sold by Nicholas Jahanian on his eBay account.  The accomplice
testimony and other evidence, discussed above, showed that (1) the theft ring,
including Cindy, stole large quantities of the types of merchandise alleged in
the indictment from the stores during the relevant time, and (2) Nicholas
Jahanian, another member of the theft ring, sold the merchandise stolen by the
ring from those stores on eBay for the benefit of the theft ring=s members.  State=s Exhibit 2A, the
eBay business records pertaining to Nicholas Jahanian=s only eBay
account during the relevant time period, showed not only the vast quantity of
merchandise of the types alleged in the indictmentCover 2,000 itemsCbut also the price
at which he actually sold each of the items.  Under these facts, the jury could
have rationally inferred that all of the types of merchandise shown on State=s Exhibit 2A and
that were alleged in the indictment and named in the court=s charge had been
stolen from those stores by the theft ring=s members.








The State concedes that the aggregate total sales price of
$258,970.36 shown on State=s Exhibit 2A for all the merchandise
Nicholas Jahanian sold on the eBay account included some items that were either
not alleged in the indictment, mentioned in the charge, or within the types of
merchandise sold by the stores and were therefore could not be included for the
purpose of calculating the value of the merchandise stolen from the stores.[7] 
But, the State argues, the jury nevertheless could have reasonably found from
State=s Exhibit 2A,
which showed the individual price paid for each item of merchandise Nicholas
sold through his eBay account in addition to the total sales price of
$258,970.36, that the aggregate value of only the items the theft ring stole
from the stores exceeded $200,000.[8] 
Cf. Wiley, 632 S.W.2d at 747B48 (holding
evidence was sufficient to support verdict against defendant alleged to have
stolen several guns and gun cases valued over $200 because, even though
appellant contended the evidence failed to show he appropriated one pistol, the
State proved the value of each item appropriated and the proof showed that two
other guns were worth more than $200 each).  We agree. 








The jury heard the cross-examinations of the witnesses,
including the various witnesses= admissions that not all of the items on
State=s Exhibit 2A were
sold by the represented stores.  The jury was capable of reviewing State=s Exhibit 2A,
which included a description of each item and the price paid for each item
Nicholas Jahanian sold on eBay, and determining which items should be
disregarded, and which were included in the indictment.  From that, the jury
could determine the aggregate value of the items it found were stolen from the
stores whose representatives were named in the indictment.  Therefore, viewed
in either the light most favorable to the verdict or in a neutral light, the
jury=s determination
that the value of the merchandise stolen from the complainants was over
$200,000.00 is supported by legally and factually sufficient evidence.  See
Valdez v. State, 116 S.W.3d 94, 98B99 (Tex. App.CHouston [14th
Dist.] 2002, pet. ref=d) (rejecting claim that evidence of value
over $200,000.00 was legally and factually insufficient in theft prosecution in
which investigator calculated the value of stolen electronic components by
determining the lowest price for which the items could have been purchased near
the time of the theft and appellant offered contradictory testimony that the
value was much lower based on the amount for which he could sell certain of the
stolen items).

Accordingly, we hold that the evidence is legally and
factually sufficient to support Cindy=s conviction for
theft of property over $200,000, and we overrule Cindy=s second and third
issues.  See Watson, 204 S.W.3d at 415B16; Jahanian v.
State, No. 14-07-00700-CR (Tex. App.CHouston [14th
Dist.] May 28, 2009, no pet. h.) (mem. op., not designated for publication)
(holding evidence that allegedly stolen items were taken from the complaining
witnesses= stores was legally and factually sufficient to
support conviction of co-defendant Nicholas Jahanian); Jahanian v. State;
No. 14-07-00702-CR (Tex. App.CHouston [14th Dist.] May 28, 2009, no pet.
h.)(mem. op., not designated for publication) (holding evidence of ownership
and value was legally and factually sufficient to support conviction of
co-defendant Krystal Jahanian).

II.       Failure
to Submit Jury Instruction on Value

In her first issue, Cindy contends that she Awas egregiously
harmed by the trial court=s failure to submit a jury instruction on
value under section 31.08 of the Penal Code.@  According to
Cindy, the value of the property allegedly stolen was a contested issue and the
charge included lesser offenses concerning the value of the property alleged to
have been stolen, but the trial court=s instructions Adid not inform the
jury how to determine the value of the property allegedly stolen.@  Cindy concedes
she did not request or object to the omission of an instruction on value, but
argues that she was egregiously harmed by the trial court=s failure to sua
sponte include a value instruction, because the jury Awas left to
speculate as to whether the value was the store price or the price the property
was subsequently sold for on eBay, and whether [Cindy] was entitled to a deduction
for monies paid as consideration to purchase the items under bogus UPC codes.@

 








A.      Standards
of Review

The review of alleged jury-charge error is a two-step
process.  Abdnor v. State, 871 S.W.2d 726, 731 (Tex. Crim. App.
1994); Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App.
1984).  First, we examine the jury charge to see if the trial court erred.  Abdnor,
871 S.W.2d at 731B32.  Second, if we find that the
trial court erred, we must determine if the harm is sufficient to warrant
reversal.  Id.  When a timely objection is made, error in the jury
charge requires reversal if the error was Acalculated to
injure the rights of defendant,@ meaning that the error was not harmless. 
See Tex. Code Crim. Proc. Ann. art. 36.19 (Vernon 2006); see also
Abdnor, 871 S.W.2d at 731B32.  But because
Cindy did not timely object to the jury charge, any error will not require
reversal unless the error is so egregious that Cindy was not given a fair and
impartial trial.  See Almanza, 686 S.W.2d at 171.  If we do find
error in the jury charge, we must review the entire record to determine whether
Cindy suffered egregious harm.  Sanchez v. State, 209 S.W.3d 117, 121
(Tex. Crim. App. 2006).  An error in the jury charge is egregious if Ait affects the
very basis of the case, deprives the defendant of a valuable right, or vitally
affects a defensive theory.@  Id.  We must assess the degree of
harm caused by a charge error Ain light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Almanza,
686 S.W.2d at 171.

B.      The Trial
Court Did Not Err in Failing to Submit Jury Instruction on Value








The value of property in theft prosecutions is (1) the fair
market value of the property at the time and place of the offense, or (2) if the fair market value of the
property cannot be ascertained, the cost of replacing the property within a
reasonable time after the theft.  See Tex. Penal Code Ann. ' 31.08(a) (Vernon
2003).  Section 31.08 also provides that if a defendant proves by a
preponderance of the evidence that he gave consideration for or had a legal
interest in the property or service stolen, Athe amount of the
consideration or the value of the interest so proven shall be deducted from the
value of the property or service ascertained . . . to determine value for
purposes of this chapter.@  Id. ' 31.08(d) (Vernon
2003).

As an initial matter, the State argues that section 31.08
does not apply to a prosecution under chapter 71 for the offense of engaging in
organized criminal activity.  See Tex. Penal Code Ann. ' 71.02(a).  The
State argues that, by its express terms, subsection 31.08(a)=s definition of
value applies only to an offense under chapter 31 of the Penal Code.  See Tex.
Penal Code Ann. ' 31.08(a) (providing that Avalue@ under section
31.08 is Avalue under this chapter@).  Further, the
State notes that subsection 31.08(d) is likewise restricted to Apurposes of this
chapter@ and so is not
required in a court=s charge for an offense under Penal Code
chapter 71, particularly in the absence of a request for it or an objection to
its omission.  In support of its argument, the State cites Garrison v. State,
726 S.W.2d 134 (Tex. Crim. App. 1987); Gray v. State, 51 S.W.3d 856 (Tex.
App.CTexarkana 2001),
pet. dism=d, 85 S.W.3d 300 (Tex. Crim. App.
2002) (per curiam); and Winters v. State, No. 14-00-00400-CR, 2001 WL
1168205 (Tex. App.CHouston [14th Dist.] Oct. 4, 2001, pet ref=d) (not designated
for publication).  In this circumstance, however, we disagree with the State=s argument and
find the State=s cases distinguishable.  








Here, the Jahanians were charged with and convicted of the
offense of organized criminal activity under chapter 71, with the underlying
offense being theft.  See Tex. Penal Code Ann. ' 71.02(a)(1) (AA person commits
an offense [of engaging in organized criminal activity] if, with the intent to
establish, maintain, or participate in a combination or in the profits of a
combination or as a member of a criminal street gang, he commits or conspires
to commit . . . theft.@).  Consistent with Penal Code section
31.03, the trial court=s charge instructed the jury on the
elements of theft.  And, consistent with Penal Code section 31.09, the jury
also was instructed as follows:  AWhen amounts are
obtained by theft pursuant to one scheme or continuing course of conduct,
whether from the same or several sources, the conduct may be considered as one
offense, and the amounts so taken aggregated to determine the grade and of the
offense and the value of property taken.@  In each of the
cases the State cites, the definition of a particular weapon was taken from a
chapter unrelated in any way to the charged offense.  See Garrison,
726 S.W.2d at 138B39 (stating that trial court should not
have included definition of Aknife@ for use in
chapter 46 offenses in prosecution for aggravated robbery and assuming error); Gray,
51 S.W.3d at 858B59 (holding that trial court erred in
including chapter 46 definition of Aknife@ in charge for aggravated
robbery under chapter 29); Winters, 2001 WL 1168205, at *2 (holding that
chapter 46 definition of Aclub@ did not apply to
aggravated assault charge at issue because definition applied only to chapter
46 offenses).  In contrast, although the primary offense alleged here was
organized criminal activity under chapter 71, the underlying offense was theft
under chapter 31, and we cannot say that including definition of Avalue@ provided in
section 31.08 in such a case would necessarily be error.








But, having determined that a section 31.08 definition of
value may be appropriate in this situation, we must still determine whether, as
Cindy argues, the trial court erred in failing to sua sponte include it
in the jury charge.  Subsection 31.08(a) generally states that the value of
property for the purpose of an offense under chapter 31 is Athe fair market
value of the property . . . at the time and place of the offense,@ except for
situations when fair market value cannot be shown, and in that case replacement
value is applied.  Although Afair market value@ is not
statutorily defined, it has long been stated to mean the amount of money that the
property would sell for in cash, giving a reasonable time for selling it.  Keeton
v. State, 803 S.W.2d 304, 305 (Tex. Crim. App. 1991).  Fair market value
may be proved by evidence of retail price, sales price, testimony of an owner=s opinion of
value, or expert opinion of value, but no single method for proving fair market
value has been held to be conclusive.  Id.  As the Court of Criminal
Appeals has recognized, A[u]se of various methods to show fair
market value is certainly due to the necessity for flexibility because of the
various circumstances of theft that arise.@  Id. 

Here, the only dispute regarding value related to the
identity of the property shown on State=s Exhibit 2A as
property stolen from the stores, as discussed above.  No evidence presented
suggested that the fair market value of the stolen items could not be proven or
that replacement value was an appropriate alternative, and there was no dispute
concerning whether the State=s evidence showing the value of the items
demonstrated their fair market value.  The State relied on its Exhibit 2A as
evidence of the value of the stolen items, and investigator Osterberg testified
that the value of the property appropriated from the stores was over $200,000
based on Nicholas Jahanian=s sales on eBay.  The investigating
officers and store representatives also testified about the retail price of
some of the items stolen, particularly when describing the events depicted on
the surveillance videos, and Brady Bailey, an investigator for Target,
testified that, on average, Nicholas Jahanian sold the type of items Target
sold for about thirty percent less than the retail price of the items.  








Although Cindy complains that the jury was left to
speculate as to whether to use the retail store price or the eBay sale price to
determine value, either method of determining value would have been valid.  See
Keeton, 803 S.W.2d at 305 (recognizing that methods of proving value must
be flexible because of the various circumstances of theft that arise). 
Moreover, the State=s reliance on Nicholas Jahanian=s eBay sales
actually benefitted the defendants because the State presented some evidence
that the retail value of the items was greater than the amount Nicholas
Jahanian received from his sales on eBay and reflected on State=s Exhibit 2A. 
Under these circumstances, the addition to the charge of a definition of value
as Afair market value@ would have been
unnecessary and would not have assisted the jury, because nothing in the record
suggests that the proof the State relied on to show value showed anything other
than fair market value as that term is both defined under the common law and is
commonly understood.  Therefore, the trial court could not have erred by
failing to sua sponte include section 31.08=s definition of Avalue@ in the charge.

Cindy relies on McKnight v. State for the
proposition that Aa trial court must give the jury a proper
guide by which to determine the value of property stolen@ and, apparently, sua
sponte instruct the jury that the value of property is the fair market
value of the property at the time and place of the offense in every theft
case.  See 134 Tex. Crim. 373, 115 S.W.2d 636 (1938).  But Cindy=s reliance on McKnight
is misplaced.  In that case, the court held that the trial court=s failure to give
a charge on value was error when the evidence showed that the property stolen,
namely automobile tires, tubes, and rims, was used as opposed to new; its fair
market value in the place where it was stolen, Nacogdoches, was questionable; and
the defendant objected to the omission.  Id. at 637.  The court
noted that, if the property had no market value, then the replacement value
would govern, and in the absence of an instruction on the market value in the
place where the property was stolen, the jury Awas at liberty to
seize upon any value without reference to the cash market value in Nacogdoches,
and without reference to it being secondhand goods.@  Id.  As
discussed above, the property at issue here was new merchandise; there was
nothing in the record to show that the evidence the State relied on to show
value demonstrated anything other than fair market value; and Cindy did not
request an instruction on value or object to its omission.  Therefore, McKnight
is distinguishable and does not control the resolution of this case.

Finally, Cindy also appears to complain that the trial
court erred in failing to include subsection 31.08(d)=s provision for
offset for consideration, because its omission left the jury to speculate as to
whether she was Aentitled to a deduction for monies paid as
consideration to purchase the items under bogus UPC codes.@  Subsection
31.08(d) specifically provides: 








If the actor proves by a
preponderance of the evidence that he gave consideration for or had a legal
interest in the property or service stolen, the amount of the consideration or
the value of the interest so proven shall be deducted from the value of the
property or service ascertained under Subsection (a), (b), or (c) to determine
value for purposes of this chapter.

Tex.
Penal Code Ann. ' 31.08(d).  Cindy contends that, contrary
to subsection 31.08(d), the prosecutor erroneously argued to the jury that the
defendants were not entitled to a deduction for consideration paid for the
stolen items, when Ait was undisputed that the modus operandi
of the theft ring was to actually give consideration for and purchase all items
allegedly stolen, albeit for a lesser price than advertised by the respective
stores.@  Thus, Cindy
concludes, the absence of a value instruction in the charge prevented the jury
from properly assessing the value of the stolen property.

When evidence from any source raises a defensive issue, and
the defendant properly requests a jury charge on that issue, the trial court
must submit the issue to the jury.  Muniz v. State, 851 S.W.2d 238, 254
(Tex. Crim. App. 1993).  But, there is no duty imposed on a trial court to
instruct the jury on unrequested defensive issues, even though the issues are
raised by the evidence.  See Bennett v. State, 235 S.W.3d 241, 243 (Tex.
Crim. App. 2007); Posey v. State, 966 S.W.2d 57, 62B63 (Tex. Crim.
App. 1998).  At least one court has held that consideration in a theft case is
a defensive issue and the trial court does not err by omitting an instruction
based on section 31.08(d) when the defendant fails to properly request it.  See
Oglesby v. State, 01-08-00158-CR, 2009 WL 144989, at *4B5 (Tex. App.CHouston [1st
Dist.] 2009, no pet.).  We agree that an instruction under section 31.08 is in
essence one pertaining to a defensive issue, and therefore, in the absence of a
request or an objection, the trial court did not err in failing to sua
sponte include such an instruction in the charge.[9] 
See Bennett, 235 S.W.3d at 243, Posey, 966 S.W.2d 62B63; Oglesby,
2009 WL 144989, at *4B5.








Even if we assume the requested instruction is not
defensive in nature, we conclude that the trial court did not err in failing to
include it in the charge because Cindy was not entitled to such an
instruction.  As noted above, for Penal Code subsection 31.08(d) to apply,
Cindy must first Aprove[] by a preponderance of the evidence
that [s]he gave consideration for or had a legal interest in the property or
service stolen.@  See Tex. Penal Code Ann. ' 31.08(d).  Cindy=s entire argument
on this portion of her issue is the following:  AThe record
reflects that every individual theft involved consideration paid at the check
out counter.  Appellant clearly established by a preponderance of the evidence
that consideration was given for all stolen property.@  But the record
shows that Cindy and the other defendants immediately rested after the State
did, offering no evidence of their own.  Cindy does not point out where in the
record she offered proof of either any total dollar amount of consideration
that she or any other member of the theft ring paid for the stolen merchandise,
or any means, formula, or reasonable basis by which such an amount could be
calculated. 








Moreover, the evidence presented is contrary to Cindy=s representation. 
The record reflects that the theft ring purchased or stole lower-priced
merchandise, often items that would ring up as roughly either about $7 or $27,
to obtain or to forge bar-code labels to put on the higher-priced merchandise
they desired.  At the stores, they switched the UPC codes on the higher-priced
merchandise with the UPC codes for the lower-priced merchandise previously obtained,
so that they could purchase the higher-priced items for the price of the
lower-priced goods.  The State=s evidence also showed that the theft ring
would return the lower-priced merchandise for a refund of some kind.  For
example, the ring would obtain a cash refund in situations in which there was a
receipt, and when there was no receipt, the ring would obtain a gift card.  As
Dee Williams testified, the cost to the Jahanians to steal the higher-priced
items was $6, and in some instances the theft ring was actually able to make a
profit on returned items.  State=s Exhibit 2A also
reflects that a number of gift cards were sold on Nicholas Jahanian=s eBay account,
providing an additional source of profit to the ring.  Consequently, even
though members of the theft ring paid the price rung up for the lower-priced
merchandise at the time they obtained the higher-priced merchandise from the stores,
the evidence showed that at least some, if not most, of the higher-priced
merchandise cost them little or nothing. 

Because Cindy directs us to no evidence that she proved by
a preponderance that she gave actual consideration to the stores for the higher-priced
merchandise, she cannot demonstrate that she was entitled to an instruction
based on subsection 31.08(d).  See Bogia v. State, No. 01-02-00950-CR,
2004 WL 253263, at *3B4 (Tex. App.CHouston [1st Dist]
2004, pet. ref=d) (mem. op., not designated for publication) (holding
trial court did not err in denying requested instruction under Penal Code
section 31.08(d) when appellant failed to prove by a preponderance of the
evidence any value conferred upon complainant). 

Therefore, we overrule Cindy=s first issue.

III.      Ineffective
Assistance of Counsel

In her fourth issue, Cindy contends that her counsel=s failure to
request jury instructions on value under Penal Code section 31.08 constituted
ineffective assistance of counsel.  Specifically, she contends that the key
issue in the case was the value of the property stolen, but her counsel did not
request instructions on value under section 31.08 or object to their omission
from the jury charge.  Additionally, Cindy complains that she was entitled to
an instruction under subsection 31.08(d) because Athe evidence
established that consideration was given whenever property was stolen@ and this
instruction Awould have required the jury to subtract such
consideration from the alleged value of the items.@

A.      Standards
of Review








In reviewing claims of ineffective assistance of counsel,
we apply a two‑prong test.  See Salinas v. State, 163 S.W.3d 734,
740 (Tex. Crim. App. 2005) (citing Strickland v. Washington, 466 U.S.
668, 687 (1984)).  To establish ineffective assistance, Cindy must prove by a
preponderance of the evidence that (1) her trial counsel=s representation
fell below the standard of prevailing professional norms, and (2) there is a
reasonable probability that, but for counsel=s deficiency, the
result of the trial would have been different.  Id.

An accused is entitled to reasonably effective assistance
of counsel.  Strickland, 466 U.S. at 686; King v. State, 649
S.W.2d 42, 44 (Tex. Crim. App. 1983).  When evaluating a claim of ineffective
assistance, the appellate court looks to the totality of the representation and
the particular circumstances of each case.  Thompson v. State, 9 S.W.3d
808, 813 (Tex. Crim. App. 1999).  There is a strong presumption that counsel=s conduct fell
within a wide range of reasonable representation.  Salinas, 163 S.W.3d
at 740 (citing Mallet v.  State, 65 S.W.3d at 59, 63 (Tex.  Crim.  App. 
2001)).  To overcome the presumption of reasonable professional assistance, A[a]ny allegation
of ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness.@  Thompson,
9 S.W.3d at 814.  When determining the validity of an ineffective-assistance
claim, any judicial review must be highly deferential to trial counsel and
avoid the distorting effects of hindsight.  Ingham v. State, 679 S.W.2d
503, 509 (Tex. Crim. App. 1984) (citing Strickland, 466 U.S. at 689). 

If a criminal defendant can prove that trial counsel=s performance was
deficient, she must still affirmatively prove that counsel=s actions
prejudiced her.  Thompson, 9 S.W.3d at 812.  This requires the defendant
to demonstrate a reasonable probability that the result of the proceeding would
have been different if trial counsel had acted professionally.  Id.  A
reasonable probability is a probability sufficient to undermine confidence in
the outcome.  Mallett v. State, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

B.      Cindy
Fails to Demonstrate that She Received Ineffective Assistance of Counsel








Cindy=s counsel=s reasons for not
requesting any charge under Penal Code section 31.08 do not appear in the
record.  Counsel may have determined that such instructions were unnecessary
under the facts of this case.  As discussed above, we have already determined
that the trial court did not err in failing to include a definition of value
under subsection 31.08(a) because there was no evidence that suggested that the
value of the stolen items was anything other than the fair market value of the items. 
Thus, Cindy has failed to demonstrate that her counsel=s representation
fell below the standard of prevailing professional norms because he failed to
request an instruction on value under subsection 31.08(a).  

Concerning the defensive instruction under subsection
31.08(d), Cindy contends that counsel=s failure to
request jury instructions on defensive theories raised by the evidence has been
held to constitute ineffective assistance of counsel.  See Storr v. State,
126 S.W.3d 647 (Tex. App.CHouston [14th Dist.] 2004, pet. ref=d) (voluntary
release of kidnap victim); Vasquez v. State, 830 S.W.2d 948 (Tex. Crim.
App. 1992) (necessity defense); Sanchez v. State, 931 S.W.2d 331 (Tex.
App.CSan Antonio 1996,
pet. ref=d); overruled
on other grounds by Woods v. State, 956 S.W.2d 33 (Tex. Crim. App.
1997) (exclusion of evidence obtained illegally).  We have already determined
that, because Cindy=s counsel did not request an instruction
on this defensive issue, the trial court did not err in failing to include such
an instruction in the jury charge.

Moreover, unlike the cases Cindy relies upon, and as
detailed above, the evidence does not establish that she was entitled to this
instruction.  See Alarid v. State, 762 S.W.2d 659, 662 (Tex. App.CHouston [14th
Dist.] 1988, pet. ref=d) (holding that appellant was not denied
effective assistance of counsel when counsel failed to request instruction
under Penal Code section 31.08(d) because appellant was not entitled to
instruction and counsel may have realized this and followed another strategy). 
Cindy has therefore failed to meet her burden to show an unprofessional error
with the meaning of the first prong of the Strickland test for
ineffective assistance of counsel.  Cindy has also failed to demonstrate that
but for her counsel=s representation, the result would have
been different.  See id.

 








We therefore overrule Cindy=s fourth issue.

Conclusion

We overrule Cindy=s issues and
affirm the trial court=s judgment.

 

 

 

 

/s/      Jeffrey V. Brown

Justice

 

 

 

 

Panel consists of
Chief Justice Hedges and Justices Guzman and Brown.

Do Not Publish C Tex. R. App. P. 47.2(b).









[1]  Cindy, Krystal Jahanian, and Nicholas Jahanian were
tried together, while Bahram Jahanian, who represented himself, was tried
separately.  All of the defendants have filed appeals in this court.





[2]  There was also evidence indicating that UPC codes
were forged for this purpose.





[3]  The indictment against Cindy, as amended, alleged
the following types of merchandise:  shavers, MP3 players, faucets, music
stations, speakers, printers, camcorders, thermostats, cameras, printer docks,
print servers, software, phones, DVD-VHS recorders, DVD recorders, paintball
markers with masks and tanks, toothbrushes, paintball guns, tennis racquets,
gift cards, water filters, and print cartridges.  The owners of the property
were alleged to be Brady Bailey, Tim Scott, Marshall Poe, and Mary Jo Meador,
as representatives of Target, Lowe=s,
Home Depot, and Wal-Mart, respectively.





[4]  The address for the Bwatchers account was Cindy=s home on Spanish Needle.





[5]  Osterberg also testified that the persons who
purchased the items from Bwatchers were not contacted by law-enforcement
personnel.





[6]  The trio were also captured on video at the second Target store, and
the State published to the jury two DVDs depicting Cindy, Krystal Jahanian, and
Elizabeth Espirit at this store as part of its examination of Osterberg
concerning the theft ring=s method of operation.





[7]  These items included, for example, two Bally=s Premier Lifetime Gym Memberships sold for a total of
$1,317.00, several pairs of U2 tickets, sold for a total of $1,045.35, an
Oldsmobile Cutlass sold for $338.00, three other cars sold for a total of
$10,349.99, and a used black leather sofa sold for $51.00.  Also on the list
were several gift cards from stores not represented in the indictment, such as
Office Depot, Linens-N-Things, Best Buy, and Academy stores. These items
reflected a small portion of the extensive list of items on State=s Exhibit 2A. 





[8]  The evidence showed that Nicholas Jahanian promptly
sold the property taken by the theft ring through his eBay account and shipped
it to the purchasers throughout the country and elsewhere.  Testimony from the
store representatives established that property taken from the stores was not
susceptible of identification by serial number or other unique identifier. 
Thus, as a practical matter, in an organized criminal activity case of this
type the State could rarely ever prove that all the property a theft ring stole
and sold in a  worldwide market such as eBay was the exact property taken from
the victims because of the manner in which the theft ring disposed of it.





[9]  We note that, in her fourth issue, Cindy contends
that her trial counsel rendered ineffective assistance because, among other
things, counsel failed to request an instruction under section 31.08(d) and
argues that A[f]ailure to request jury instructions on defensive
issues has been held to constitute ineffective assistance of counsel.@  Thus, Cindy acknowledges that an instruction under
section 31.08(d) raises a defensive issue.